Filed 12/29/22  S.Y. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| S.Y., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF MONTEREY COUNTY, <br><br> Respondent; <br><br> MONTEREY COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Real Party in Interest. | H050408 <br> (Monterey County <br> Super. Ct. No. 22JD000006) |

N.B. (the minor), an infant girl, was placed in protective custody on January 4, 2022, shortly after her birth.  The Monterey County Department of Social Services, real party in interest (Department), filed a juvenile dependency petition on January 6, 2022, alleging the failure of the mother, petitioner S.Y. (Mother), and the father, J.B. (Father), to provide care and supervision or protection for their child under Welfare and Institutions Code section 300, subdivision (b).[1]  The Department alleged that N.B. had four older siblings and that the Department had received 11 referrals regarding the family

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

alleging general neglect of N.B.'s siblings, physical abuse of one of N.B.'s siblings, caretaker absence or incapacity, and emotional abuse of the children by Mother. Of the referrals that were investigated, two were substantiated and N.B.'s four older siblings were dependents of the Monterey County Juvenile Dependency Court. The Department alleged Mother had criminal and substance abuse histories, including during her pregnancy with N.B., that impacted her ability to care for the minor. The juvenile court sustained the allegations of the petition in February 2022 and granted the parents family reunification services. In September 2022, after a six-month review hearing, the court terminated Mother's and Father's family reunification services and scheduled a selection and implementation hearing pursuant to section 366.26 (366.26 hearing) for January 17, 2023.

Mother filed a petition for extraordinary writ to compel respondent superior court to vacate its order terminating her family reunification services. She contends that the juvenile court erred in finding that she had not participated regularly and made substantive progress in her court-ordered treatment plan. We conclude that Mother's claim lacks merit. Accordingly, we will deny the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Petition and Detention (January 2022)

On January 6, 2022, the Department filed a juvenile dependency petition alleging that the parents had failed to supervise or protect the minor, who was detained on January 4, 2022, and that the parents were unable to provide regular care for the minor due to their mental illness, developmental disability, or substance abuse. (§ 300, subd. (b)(1).) The Department alleged, inter alia, that Mother had criminal and substance abuse histories, including while pregnant with N.B., that impaired her ability to care for the minor. Mother had five children under the age of 14, including newborn N.B. Prior to N.B.'s birth, the Department had received 11 referrals regarding the family alleging general neglect, physical abuse, caretaker absence or incapacity, and emotional abuse of

2

the children by Mother. Of the referrals that were investigated, two were substantiated, and N.B.'s four older siblings were dependents of the Monterey County Juvenile Dependency Court. The Department recited several incidents involving Mother and Father causing concern for the minor's welfare and safety that led to the filing of the petition.

In May 2018, Mother was arrested for driving under the influence of alcohol with the older children in the car. Mother and the children had been homeless and living in the car for approximately two months. Dependency petitions were filed for each of the four older children. One child was placed with his father with family maintenance services and his case dismissed at the six-month status review hearing. Mother received 18 months of family reunification services however she was inconsistent with her participation and did not keep in contact with the Department. Mother's family reunification services were terminated in December 2019, and her parental rights as to another child were terminated in June 2020. A legal guardianship was established for the remaining two children in September 2020.

Mother gave birth to N.B., and shortly thereafter, on January 3, 2022, the Department received a referral alleging general neglect. It was reported that Mother was supposed to be taking Suboxone, a medication used to treat opiate addiction, but had failed to attend numerous medical appointments. Mother tested positive for marijuana and amphetamines in August 2021 and for alcohol and heroin in September 2021. Mother also reportedly demanded opiate treatment to manage her pain, though a physician at the hospital later reported that Mother's request for stronger pain medication is expected in someone with a history of opioid abuse and that Mother did not receive an unusual quantity of pain medication for a postpartum patient. Mother had negative toxicology upon hospital admission. N.B. had a high-pitched cry, but it was undetermined whether this was due to Suboxone or other drug use. Mother was then on parole, having been released from jail to the Sun Street program in June 2021. Mother's

3

probation officer reported in early January 2022, that Mother had been doing well for the past month and that her last drug test in December 2021 was negative. However, Mother's probation officer had not tested Mother regularly because Mother was supposed to be tested at her Suboxone appointments, which Mother frequently missed.

An Emergency Response Child and Family Team meeting was held on January 4, 2022. The team discussed the parents' outstanding criminal charges and ongoing criminal history and Mother's previous dependency cases. Mother insisted she had not asked for opiate treatment at the hospital but had informed hospital staff of her addiction. Sun Street staff reported that Mother was still attending their outpatient program but had been participating via Zoom and had not been drug testing. Both parents reported having jealousy issues that often led to retaliation and aggression. Following the meeting, law enforcement took N.B. into protective custody. The Department approved placement with a paternal aunt and her boyfriend upon N.B.'s discharge from the hospital.

Initial and contested detention hearings were held on January 7 and 11, 2022. The court found that a prima facie showing had been made with respect to the allegations in the petition and ordered that N.B. remain under the Department's care, custody, and control.

On January 12, 2022, the Department filed an amended juvenile dependency petition. Therein the Department reported that the aggression between the parents was ongoing. During a visit with N.B. on January 6, 2022, the parents had an argument in which Mother told Father that he treated her "like 'shit' " and that he was a bad person. Father stated that the newborn baby was making the visit boring by sleeping and told Mother to " 'wake her ass up.' " On January 10, 2022, law enforcement responded to an incident of domestic violence between the parents. On January 11, 2022, law enforcement notified the Department that Father had reportedly physically assaulted Mother. Father had criminal charges from 2021, including carrying a loaded firearm, gang involvement with a "concealed carry weapon," and vandalism, and he failed to

4

appear for a preliminary hearing on January 12, 2022, resulting in the issuance of two bench warrants. At a further contested detention hearing on January 13, 2022, the court found that a prima facie showing had been made, ordered that drug testing for the parents continue, and ordered that N.B. remain under the Department's care, custody, and control.

### B. Jurisdictional/Dispositional Orders (February 2022)

A jurisdictional and dispositional hearing was scheduled for February 15, 2022. In its report in anticipation of the hearing, the Department recommended that the court sustain the petition, adjudge N.B. a dependent of the court, remove her from her parents, and offer reunification services to the parents. N.B. had been placed with a paternal aunt. Mother was facing criminal charges for vandalism of $400 or more, unlawful entry into a noncommercial dwelling, and battery on a non-cohabiting partner, and had a pre-trial hearing set for March 22, 2022. Mother and Father each had prior criminal histories. After the incident on January 10, 2022, in which Father had reportedly assaulted Mother, Mother informed the Department that there was an active temporary restraining order protecting her and N.B. from Father and that she knowingly violated the order by remaining in contact with Father. The Department reported that during a meeting on January 26, 2022, Mother informed that Department that she was tired of the arguing and lack of stability she felt with Father and intended to focus instead on herself and reuniting with N.B. However on February 4, 2022, a day after a temporary restraining order was terminated due to the parents not appearing for an order to show cause hearing, the parents reported that they had reconciled and "wanted to make things work as a family." On February 8, 2022, the parents reported that they had separated again.

The Department also reported that mother had been engaging in services such as the Sun Street outpatient program, parenting classes through Partners for Peace, intimate partner classes, and an initial intake meeting with the Mentor Mom coordinator. The

father had started to attend Sun Street outpatient and had begun his Family Mental Health Assessment.

After an initial joint visit, the parents had been having separate visitation with N.B. due to the restraining order and ongoing issues between the parents. Mother was emotional upon seeing N.B. for weekly supervised visits. She was attentive toward N.B., talked to, sang to, and played lullabies for her. Mother held N.B., affectionately touched her face, called her " 'Princess,' " and told her she missed her and loved her. Mother was late to a visit on January 20, 2022, reportedly due to her probation officer making an unannounced home visit. She did not attend a visit on February 3, 2022, stating she was feeling sick.

Due to the restraining order that listed N.B. as a protected party, and expired on February 3, 2022, Father had had two supervised visits with the minor, the first being a joint visit with Mother and the second an individual visit. Father arrived approximately 20 minutes late to his only individual visit. When N.B. began to cry, Father picked her up from the stroller and held her; he attempted to give her a pacifier but stated he did not know how to put it in her mouth.

At Mother's request, the court set the matter for a contested jurisdictional hearing on February 22, 2022. At the hearing the court found the allegations in the petition true, declared N.B. a dependent of the court, and ordered family reunification services to the parents along with visitation in accordance with their case plans. The court also ordered visitation with N.B.'s siblings and maternal and paternal relatives as arranged by the Department. A three-month review hearing was set for May 10, 2022, and a six-month review hearing was set for August 9, 2022. At the three-month review hearing, the court ordered N.B. to continue as a dependent of the court and in the care of the Department.

**C. Termination of Reunification Services**

In anticipation of the six-month review hearing, the Department recommended termination of family reunification services to both parents. In its status review report

filed on August 3, 2022, the Department recommended that the court maintain the minor's dependency and out-of-home care, terminate the parents' family reunification services, and set the matter for a selection and implementation hearing in December 2022. The Department reported that on May 2, 2022, Mother had been granted a restraining order protecting herself from Father, which order was set to expire on April 28, 2023. Both parents were incarcerated: Mother had been incarcerated on May 6, 2022, stemming from prior criminal charges of driving under the influence, vandalism, and theft, and was expected to be released on August 20, 2022. Father was incarcerated on April 27, 2022, for misdemeanor and felony charges of burglary, battery, violation of a protective order, grand theft, and possession of a firearm as a felon, and his expected release date was unknown. N.B.'s caregivers (a paternal aunt and boyfriend) reported that the minor appeared to be meeting all developmental milestones, was happy and affectionate, and appeared attached to the caregivers. The caregivers were committed to providing a permanent home for N.B. if the parents were unable to reunify.

The Department further reported that Mother had consistent communication with the Department and made strong efforts to provide updates regarding her pending criminal matters, case plan participation, and disputes with Father. Mother did not appear for drug tests in January, March, and April 2022, though she reported that she was maintaining sobriety. The Department attempted to contact Mother's probation officer for information about Mother's sobriety compliance, however Mother had not signed a release authorizing her probation officer to disclose information. During a parent meeting on April 27, 2022, Mother informed the Department that she had been attending virtual Narcotics Anonymous meetings, was continuing to attend services through the Sun Street Centers, was working with a sponsor on "Step 1," and was actively working with her mentor mom. Mother admitted that her alcohol and substance use caused the removal of and her non-reunification with her children, and she expressed an interest in maintaining sobriety to be able to safely parent N.B. Mother shared that her missed drug

screenings were due to transportation challenges and that she would ask her probation officer to provide verification of her drug screenings to the Department.

Prior to her incarceration, Mother reported to the Department that she was actively engaged in individual therapeutic services through the Monterey County District Attorney's Office. Due to her incarceration, Mother ceased participating in mental health services. On March 31, 2022, Mother had been referred to the Parent Education Group, however she was not able to participate as she was initially on the waiting list and then unable to participate due to her incarceration. Mother did not participate in parenting classes during this review period, but she provided the Department with a certificate of completion, dated March 30, 2021, for parenting classes through Partners for Peace. Mother shared that she took pride in being a " 'great mom,' " that she was an active mother, and that she felt confident she could meet N.B.'s needs. However Mother was unable to articulate or discuss concepts learned in the parenting class or share how she would be able to meet N.B.'s needs.

The Department further reported that Mother continued to report ongoing domestic abuse by Father, despite consistently stating that she intended to terminate the relationship. On March 21, 2022, Mother reported that Father had physically abused her during a verbal altercation that occurred while he was driving her to an appointment, during which he repeatedly called her a " 'slut' " and struck her when she yelled at him to " 'shut up.' " On April 8, 2022, Mother was granted a temporary restraining order which included her children, as Father was posting portions of the Department's jurisdictional/dispositional report to Facebook. Mother also reported that Father consistently contacted her, during which he used verbally abusive and derogatory language toward her and her children. On April 6, 2022, Mother participated in and completed a domestic violence support group through the YWCA. Mother denied Father's allegations that she stole his pickup truck to strip it for parts or that she constantly called Father and his mother to harass them. On May 2, 2022, the court issued

8

a protective order as to Mother only. During a parent meeting at the Monterey County Jail on May 26, 2022, Mother reported that Father continued to attempt to communicate with her through other inmates. Mother also expressed frustration about N.B.'s removal but acknowledged that the family did not follow their safety plan.

Prior to his incarceration, Father had intermittent contact with the Department. During his incarceration, the Department attempted unsuccessfully to meet with Father in May, June, and July 2022. During this review period, Father was candid regarding his substance abuse. On March 28, 2022, Father informed the Department that he had begun the intake process for Sun Street Centers and was attending Narcotics Anonymous meetings, which his mentor dad confirmed. On April 20, 2022, Father reported ongoing methamphetamine use but that he was expected to be admitted for residential treatment on April 28, 2022. On April 22, 2022, Father submitted to a hair follicle test which was positive for amphetamines and methamphetamine. On April 27, 2022, Father was arrested and incarcerated following a criminal court hearing.

Due to his incarceration, Father was unable to participate in individual therapeutic services for which he was referred to address challenges with anger, depression, and anxiety. The Department referred Father to parenting and domestic violence classes in January 2022, however he was placed on waiting lists and unable to participate prior to his incarceration. Father consistently reported to the Department that Mother was a "trigger" for him and his family, that she and her associates repeatedly called Father and his mother to harass and shame them for Father's criminal matters, substance use, domestic violence, and the dependency case. Despite the Department's recommendations to do so, neither party apparently filed police reports. On March 28, 2022, Father reported ongoing contact with and physical abuse by Mother. Father denied the incident that led to Mother filing a request for restraining order the previous week. On April 20, 2022, Father reported that Mother and her associates continued to call him and that his stolen truck was found in Mother's backyard being dismantled. Father acknowledged a

9

cycle of abuse with Mother and stated that the original circumstances leading to N.B.'s removal were due to Mother making repeated disrespectful and antagonizing statements. Father asserted that Mother's ongoing verbal and emotional abuse led to his violent outburst that caused N.B.'s removal. The Department reported that it had been unable to engage in meaningful discussions with Father about his role in the domestic violence and how it impacted the minor.

Prior to her incarceration, Mother had biweekly supervised visitation with N.B. She frequently arrived on time and actively engaged N.B. in talk, feedings, and soothing with no concerns observed. During visits, Mother also contacted her other children via video calls so they could see N.B. Mother missed three visits in April 2022 due to her criminal matters and missed a fourth visit due to reportedly being ill. Her last visit was on May 5, 2022, as she was incarcerated the following day.

Father participated in supervised visitation during the review period prior to his incarceration. He was observed to be nurturing with the child, as he talked with her, fed her, and changed her diaper. Father fell asleep during two of his visits in March 2022, which Father admitted and stated it was because he was four days sober. No other concerns were observed during Father's visits. On March 28, 2022, Father's visits were placed on hold due to Mother's temporary restraining order. Father did not have any further visits prior to his incarceration.

Concluding its report, the Department expressed concern that returning N.B. to her parents' care would be detrimental given Mother's history of engaging in abusive relationships, her denial of engaging in abusive behaviors toward Father, and that her behaviors might expose N.B. to further trauma. The Department also noted that Mother repeatedly missed random drug screenings and that she had missed approximately three months of visitation due to her incarceration. The Department expressed continuing concern about Mother's criminal history and her previous child welfare history in which she was unable to successfully reunify with her other children.

With respect to Father, the Department reported that returning N.B. to his care would be detrimental because Father had been unable to participate in any domestic violence classes and had not developed the skills or insight necessary to have positive and healthy interactions with Mother due to his incarceration. Due to his inability to meet with the Department, Father's insight as to how domestic violence might traumatize N.B. was unknown. The Department also expressed concern that Father continued to use methamphetamine until his incarceration and was unable to engage in substance abuse services due to his incarceration. Because Father was unable to consistently visit N.B. due to the temporary restraining order and his incarceration, the Department was unable to fully assess his ability to safely interact with and parent N.B. Finally, Father was still awaiting sentencing for his criminal matters and the Department was unsure whether Father would be available to participate in case plan services upon his release within the time allotted by law.

The parents each expressed a preference that N.B. remain with her current caregivers if unable to reunify. The caregivers also expressed a commitment to providing a permanent home and to ensuring that N.B. has a connection to her siblings. The Department recommended that the court terminate family reunification services to both parents and that N.B. remain in her current caregivers' home with the permanency plan of adoption.

In addition to its report, on August 3, 2022, the Department filed several workbooks completed separately by Mother and Father. A "12 Step Workbook" provided "a list of questions for working the 12 Step program for recovery from addictive behavior." A workbook for a "Brief Intervention Program" was "for substance using adolescents" (capitalization omitted). A "Safe from the Start Parent Workbook" provided "a guide to your young child's healthy brain development." (Capitalization omitted.) Other workbooks addressed substance use and brain injury, as well as successful parenting. The Department reported that Father had been referred for therapy

services to address mental health struggles in the areas of anger, depression, and anxiety "secondary to recent stressors."

On August 9, 2022, the court held an uncontested six-month review hearing. The parents requested a contested hearing, which the court initially set for August 31, 2022. Mother reported that she was scheduled for release from jail on September 3, 2022.

On September 13, 2022, the court held the six-month contested review hearing. Mother did not attend the hearing. Her counsel reported that, to her knowledge, Mother had been released from jail but had a medical incident. She further stated that Mother had informed her mentor mom that she had tuberculosis and had gone to the hospital. Mother's counsel reported that she had a note from Natividad Medical Center (Natividad) which said Mother had been seen on September 12 through 13, 2022, and could return to school or work on September 17, 2022. Mother's counsel also stated she had a note from Community Hospital of the Monterey Peninsula (CHOMP) but was unable to read it. During or just prior to the hearing, the Department contacted Natividad, which reported that it had no record of Mother's admittance and had not seen her since March 30, 2022. County counsel stated that CHOMP reported that it did not have a record of a patient with Mother's name and did not have a discharge record. Mother's mentor mom stated that she had spoken with Mother that morning, who informed her that she was seen at CHOMP for tuberculosis, and that in the afternoon, Mother told her mentor mom that she was seen at Natividad.

Mother did not answer calls from her mentor mom during the hearing and did not log on to the hearing virtually after being sent the Zoom link. Unable to verify the reason for Mother's absence, the court held the hearing without her. Mother's counsel presented certificates on Mother's behalf evidencing her completion in the Partners for Peace parenting program and the YWCA domestic violence support group, as well as the notes from Natividad and CHOMP.

The Department social worker testified during the hearing, consistent with the Department's earlier reports. He testified that Mother was incarcerated for approximately four months beginning on May 6, 2022, and that Mother had completed workbooks provided by the Department during her incarceration. Mother had not informed the Department whether she was attending substance abuse meetings while incarcerated, though she told the Department in April 2022 before she was incarcerated that she was participating in substance abuse treatment through Sun Street. At that time, Mother also informed the Department that she was attending virtual Alcoholics Anonymous and Narcotics Anonymous meetings, but she did not provide verification. The social worker further testified that Mother had obtained a restraining order, still in effect, due to domestic violence, and was attending therapeutic services through the district attorney's office. He also stated that despite Mother's case plan requiring random drug testing, she never completed such testing. Because Mother had not signed a release of information regarding her therapeutic services, the Department had no information regarding her therapeutic progress. The social worker opined that Mother had not presented any insight regarding parenting or parenting skills, given that she had previous dependency cases resulting in her losing custody of her other children. Additionally, Mother provided the social worker with minimal insight of what she had learned from parenting classes.

Regarding Mother's incarceration, the social worker testified that Mother informed him that she had been presented with two options regarding sentencing: either serve her sentence in its entirety while incarcerated or be released on probation for up to one year. The social worker concluded that by choosing incarceration, mother had absented herself from reunification services.

After testimony by the Department social worker and argument from the parties, the court stated its findings and orders. Among other things, the court found that Mother failed to sufficiently participate in court-ordered treatment programs and that her progress toward alleviating or mitigating the cause necessitating placement had been minimal.

13

The court noted that Mother had completed some components of her case plan, but had not provided proof of substance abuse treatment or therapy. The court also observed that due to Father's incarceration and eventual sentence of six to eight years in prison, there was no likelihood that N.B. would be returned to Father's care. The court ordered N.B. to remain a dependent, terminated family reunification services to the parents, and set the matter for a 366.26 selection and implementation hearing on January 13, 2023. On September 27, 2022, the court vacated the 366.26 hearing date and reset it to January 17, 2023.

### D. Petition for Extraordinary Writ

Mother filed timely under rule 8.450(e) of the California Rules of Court[2] a notice of intent to file a petition for extraordinary writ to review the court's order of September 13, 2022, terminating services. Thereafter, Mother filed her petition for extraordinary writ with this court on October 31, 2022. (See Rule 8.452.) Real party in interest Department filed its opposition on November 15, 2022.

## II. DISCUSSION

### A. Applicable Dependency Law

Section 300 et seq. provides "a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare. [Citations.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) As our high court has explained, "[t]he objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time. [Citations.] Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest

---

[2] All further rule references are to the California Rules of Court.

14

that a state has not only a right, but a duty, to protect. [Citations.] The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. [Citations.] This interest is a compelling one. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

A high priority in dependency proceedings is placed upon the expeditious implementation of services and placement of the dependent child. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 674.) Our high court – enunciating a point very relevant to this case involving a child who was less than one year old at the time of the child's removal – has explained: "We have long recognized that providing children expeditious resolutions is a core concern of the entire dependency scheme. [Citations.] If this is true of dependency cases in general, it is doubly true for the very young." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 847, fn. 4 (*Tonya M.*).)

The juvenile court at the jurisdictional hearing must first determine whether the child, by a preponderance of the evidence, is a person described under section 300 as coming within the court's jurisdiction. (§ 355, subd. (a).) Once such a finding has been made, the court, at a dispositional hearing, must hear evidence to decide the child's disposition (§ 358, subd. (a)), i.e., whether he or she will remain in, or be removed from, the home, and the nature and extent of any limitations that will be placed upon the parents' control over the child, including educational or developmental decisions. (§ 361, subd. (a).) If at the dispositional hearing, the court determines that removal of the child from the custody of the parent or guardian is appropriate, such removal order must be based upon clear and convincing evidence establishing that one of five statutory circumstances exists. (*Id.*, subd. (c).) One such circumstance is when "there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable

15

means by which the minor's physical health can be protected without removing" him or her from the physical custody of the parents. (*Id.*, subd. (c)(1).)

After it has been adjudicated that a child is a dependent of the juvenile court, the exclusive procedure for establishing the permanent plan for the child is the permanency hearing as provided under section 366.26. The essential purpose of the hearing is for the court "to provide stable, permanent homes for these children." (*Id.*, subd. (b); see *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)

When the dependent child is removed from parental custody, the juvenile court is ordinarily required to provide the parent with services to facilitate the reunification of the family. (§ 361.5, subd. (a); see *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 303.)[3] As explained by one court: "The importance of reunification services in the dependency system cannot be gainsaid. The law favors reunification whenever possible. [Citation.] To achieve that goal, ordinarily a parent must be granted reasonable reunification services. [Citation.] But reunification services constitute a benefit; there is no constitutional ' "entitlement" ' to those services. [Citation.]" (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

Reunification services that are ordered generally (subject to exceptions and instances in which the period may be extended) begin with the dispositional hearing and, for children three years or older, end 12 months thereafter. (§ 361.5, subd. (a)(1)(A).) But where a child is under three at the time of his or her initial removal, reunification services are normally granted for a period of six months, but no longer than 12 months after the minor's placement in foster care. (*Id.*, subd. (a)(1)(B).) Therefore, as the

---

[3] Section 361.5, subdivision (a) states that, "[e]xcept as provided in subdivision (b), . . . whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians. . . ." A court may order that reunification services be bypassed altogether if one of the circumstances specified in subdivision (b) of section 361.5. is established by clear and convincing evidence.

California Supreme Court has explained, for parents of a child under three at the time of removal, the statutory scheme of providing reunification services establishes "three distinct periods and three corresponding distinct escalating standards." (*Tonya M.*, *supra*, 42 Cal.4th at p. 845.) In the first period – a phase where services are "presumed" – from the jurisdictional hearing to the six-month review hearing, "services are afforded essentially as a matter of right [citation]." (*Ibid.*) In the second phase – a period where services are "possible" – from the six-month review hearing to the 12-month review hearing, "a heightened showing is required to continue services." (*Ibid.*) And in the third phase – a period where services are "disfavored" – from the 12-month review hearing to the 18-month review hearing, "services are available only if the juvenile court finds specifically that the parent has 'consistently and regularly contacted and visited with the child,' made 'significant progress' on the problems that led to removal, and 'demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.' [Citation.]" (*Ibid.*)

Prior to the permanency hearing, there are periodic status reviews as ordered by the court, but not less frequently than every six months. (§ 366, subd. (a)(1).) "At the review hearing held 6 months after the initial dispositional hearing [the six-month review hearing], . . . the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).)[4] "Review hearings are critical because they are the point at which a parent may be denied further reunification services. [Citation.]" (*In re*

---

[4] Assembly Bill No. 2866 (2021-2022 Reg. Sess.) proposed amendments to section 366.21, which are set to take effect January 1, 2023. The proposed amendments do not substantively alter the subsections discussed herein.

*Jesse W.* (2007) 157 Cal.App.4th 49, 61; see also *In re Derrick S.* (2007) 156 Cal.App.4th 436, 450 [reunification is "standard topic at" six-month review hearings].)

At a six-month review hearing, when a child is under three at the time of his or her initial removal, the court has the discretion under certain circumstances to set a 366.26 hearing and to terminate reunification services. (§ 366.21, subd. (e)(3).) [5] The juvenile court at the six-month review must make "two distinct determinations" in ascertaining whether it has and may exercise such discretion under section 366.21, subdivision (e)(3). (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 (*M.V.*).) "First, the statute identifies specific factual findings – failure to participate regularly and make substantive progress in the court-ordered treatment plan – that, if found by clear and convincing evidence, would justify the court in scheduling a [366.26] hearing to terminate parental rights. . . . [¶] The second determination . . . [is that, n]otwithstanding any findings made pursuant to the first determination, the court shall not set a [366.26] hearing if it finds either (1) 'there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months . . .'; or (2) 'reasonable services have not been provided . . .' to the parent. [Citation.] In other words, the court must continue the case to the 12-month review if it makes either of these findings." (*Id.* at pp. 175-176, italics omitted.) But if the court, in making both determinations, concludes that it is thereby empowered to set a 366.26 hearing, it is nonetheless not compelled to do so. Section 366.21,

---

[5] Section 366.21, subdivision (e)(3) states: "If the child was under three years of age on the date of the initial removal, or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child, who was under three years of age on the date of initial removal or is a member of a sibling group described in subparagraph (C) of paragraph (1) of subdivision (a) of Section 361.5, may be returned to his or her parent or legal guardian within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing."

subdivision (e)(3) merely authorizes the juvenile court, in its discretion, to set a 366.26 hearing. (*M.V.*, *supra*, at p. 176; see also *S.T. v. Superior Court* (2009) 177 Cal.App.4th 1009, 1015-1016 (*S.T.*).) If the court at the six-month review hearing exercises its discretion to set a 366.26 hearing within 120 days, it must terminate reunification services at that time. (§ 366.21, subd. (h).) But the juvenile court may not order a 366.26 hearing "unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." (§ 366.21, subd. (g)(1)(C)(ii).)

## B. Standard of Review

As explained above, in the case of a child under three, in order to determine whether a juvenile court is empowered at the six-month review to set a 366.26 hearing (thereby terminating reunification services), it must first make "two distinct determinations," namely, (1) whether by clear and convincing evidence there has been a "failure [of the parent] to participate regularly and make substantive progress in the court-ordered treatment plan" that would justify the setting of a 366.26 hearing, and (2) whether " 'there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months . . .'; or . . . 'reasonable services have not been provided . . .' to the parent. [Citation.]" (*M.V.*, *supra*, 167 Cal.App.4th at pp. 175-176.)

Based upon the circumstances presented here, our review of the order terminating reunification services after a six-month review hearing is under a substantial evidence standard. (See *J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)[6] In determining whether substantial evidence supports the court's decision, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the

---

[6] If the juvenile court's two determinations under section 366.21, subdivision (e)(3) are supported by substantial evidence, then the court is empowered, but is not required, to set a 366.26 hearing. (*M.V.*, *supra*, 167 Cal.App.4th at pp. 176, 179; see also *S.T.*, *supra*, 177 Cal.App.4th at pp. 1015-1016.) Thus, the decision to set a 366.26 hearing is reviewed for abuse of discretion. (See *M.V.*, *supra*, at pp. 176, 179.)

19

evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.]" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689 (*Kevin R.*).) A reviewing court will uphold a finding based upon clear and convincing evidence if "the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012; see also *In re V.L.* (2020) 54 Cal.App.5th 147, 155 [*Conservatorship of O.B.* standard applies to findings by clear and convincing evidence in dependency proceedings].) It is the petitioner's burden to establish that the evidence was insufficient to support the juvenile court's findings. (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) And the juvenile court's order, "like any other judgment or order of a lower court, is presumed to be correct, and all intendments and presumptions are indulged to support the order on matters as to which the record is silent. [Citation.]" (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 88.)

### C. No Error in Order Terminating Services

As noted, the trial court here at the six-month review was required to make "two distinct determinations" in resolving whether it could, in its discretion, terminate Mother's services and set a 366.26 hearing. (*M.V.*, *supra*, 167 Cal.App.4th at p. 175.) First, it was required to find "by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3).) Second, if the juvenile court so found, it was prohibited from exercising its discretion to set a 366.26 hearing if it found either that "[(a)] there [was] a substantial probability that the child . . . may be returned to . . . her parent . . . within six months or [(b)] that reasonable services [had] not been provided" to the parent. (§ 366.21, subd. (e)(3); see *M.V.*, *supra*, at pp. 175-176.)

Consistent with the requirements for setting a 366.26 hearing, the juvenile court below expressly found, inter alia, that, based upon clear and convincing evidence, Mother

20

had failed to participate regularly and make substantive progress in a court-ordered treatment plan. In its written order, the court also found that the Department offered or provided to the parents reasonable services designed to assist them to overcome the problems that led to the minor's removal and that there was not a substantial probability of returning N.B. to one or both parents within six months. The court terminated reunification services for both parents and scheduled a 366.26 hearing for January 13, 2023, later rescheduled to January 17, 2023.

On appeal, Mother contends that the court should have continued reunification services at the six-month hearing because she had participated regularly and made substantive progress in her court-ordered case plan. She argues that the Department did not present sufficient evidence to the contrary. She does not challenge the juvenile court's remaining findings or assert that the Department failed to offer or provide her reasonable services. We therefore address Mother's sole claim on appeal.

The Department was required to show "that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3).) The juvenile court so found. As the authors of one treatise on juvenile dependency have explained, this statutory language "must be read as two related, but independent requirements. If the agency proves by clear and convincing evidence that the parent has *either* failed to participate regularly in the court ordered treatment plan *or* that the parent had participated but failed to make substantive progress, the court may schedule a [366.26] hearing unless there is a substantial probability of return by the date of the 12-month permanency hearing [citations]." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2022) § 2.152[5][b][ii], italics added.)

Mother's counsel argues in the petition that Mother had both participated regularly in her case plan services and that Mother made significant progress. To the contrary, there was substantial evidence to support the juvenile court's finding that Mother had not participated regularly or made substantive progress. Perhaps the most telling evidence

21

negating Mother's substantive progress was her (and Father's) repeated violations of the temporary restraining orders. Throughout the review period Mother reportedly obtained three separate restraining orders against Father, the first in January 2022 expiring on February 3, 2022, a second on April 8, 2022 expiring on April 28, 2022, and a third on May 2, 2022, expiring on April 28, 2023. The record is replete with evidence of contacts between Mother and Father in violation of the restraining orders. These repeated contacts occurred notwithstanding the parents' separation and stated intent of focusing on N.B. And parents engaged in at least two incidents of reported physical abuse, in January and March 2022, despite Mother acknowledging to the Department a cycle of being in abusive relationships and need to develop insights into the impact of domestic violence in order to care for and keep N.B. safe.

In addition, although it was commendable that Mother completed multiple educational workbooks regarding domestic violence, substance abuse, and parenting while incarcerated, she was unable to articulate what she learned as a result of completing those exercises.

Further, Mother failed to comply with random drug testing required by her case plan and declined to sign a release of information authorizing the Department to obtain drug testing information from her probation officer. In addition, Mother reported to her social worker that, prior to her incarceration, she was participating in therapeutic services through the district attorney's office, checking in with her mentor mom on a weekly basis, and attending Alcoholics Anonymous and Narcotics Anonymous meetings. However, Mother offered no independent proof of her engagement in any of these services or evidence of what progress was achieved as a result of those services. Moreover, Mother voluntarily absented herself from further services and visitation by opting for incarceration over probation.

Finally, Mother failed to appear at the contested six-month review hearing, either in person or remotely via Zoom. Neither her attorney nor her mentor mom was able to

22

contact her during the hearing and the Department was unable to verify Mother's reported illness or admission to a hospital. On appeal, Mother does not offer further explanation for her failure to appear, nor does she assert that she lacked notice of the hearing. " '[A]n unjustified failure to appear at a duly noticed hearing reflects a parent's choice not to attend,' and the juvenile court 'may properly treat this choice as a waiver of the right to be present at that hearing and of the benefits of being present.' [Citation.]" (*In re A.V.* (2021) 73 Cal.App.5th 949, 957, italics omitted.) Mother's absence from the hearing is consistent with the court's finding that she had not participated regularly or made substantive progress in the court-ordered treatment program.

Viewing the evidence "in the light most favorable to the [juvenile] court's determinations and draw[ing] all reasonable inferences from the evidence to support [those] findings" (*Kevin R.*, *supra*, 191 Cal.App.4th at pp. 688-689), we conclude that "the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable" (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011) that Mother had "*either* failed to participate regularly in the court ordered treatment plan *or* that [she] had participated but failed to make substantive progress." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure, supra, § 2.152[5][b][ii], italics added.)

Mother, who was represented by counsel, submitted no argument below that the family services provided or offered by the Department were not reasonable, or that there was a substantial likelihood of reuniting with N.B. within six months. Any claim by Mother concerning the adequacy of services provided or offered or concerning the likelihood of reunification is thus forfeited. "[A] parent is prevented from challenging the reasonableness of services on appeal if the issue was not first brought to the attention of the juvenile court. [Citation.]" (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1347-1348, fn. 5; see also *In re Christina L.* (1992) 3 Cal.App.4th 404, 416 ["If Mother felt during the reunification period that the services offered her were inadequate,

23

she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan."]; see also *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [appellate arguments "neither timely nor fully made" deemed forfeited].) Further, Mother's attorney presents no argument on these issues in her petition. Mother has therefore doubly forfeited any potential challenge to these issues. (See *Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 776, [appellant that failed to assert argument at trial level or in opening brief " 'doubly waived' " it].)

It is very apparent to this court that Mother loves the minor very much. Here, however, there was substantial evidence supporting the court's conclusions that (1) the minor was less than three years old at the time of her removal; and (2) by clear and convincing evidence, Mother failed to participate regularly and make substantive progress in a court-ordered treatment plan. (See § 366.21, subd. (e)(3).) Based upon these supported findings, the court, in its discretion, could set a 366.26 hearing and terminate family reunification services. (*M.V.*, *supra*, 167 Cal.App.4th at pp. 176, 179.) Therefore, the court did not err by terminating reunification services and setting the 366.26 hearing.

### III.   DISPOSITION

The petition for extraordinary writ and the request for stay are denied.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*S.Y. v. Superior Court*
**H050408**